UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH **LANBNEWS@GMAIL.COM;** THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE, INC. | Mag. No. _____ |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Ted P. Delacourt, being first duly sworn, herby depose and state as follows:

1.      I make this affidavit in support of an application for a search warrant for all information associated with a certain accounts that are stored at premises controlled by Google, Inc., an e-mail provider headquartered at1600 Amphitheatre Parkway, Mountain View, CA 94043.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      Your Affiant has been employed the FBI since September of 2004, and as a Special Agent since September 2005.  Since 2005, I have received training and experience in interviewing and interrogation techniques, and arrest and search procedures.  I was assigned as a Special Agent in the Jacksonville Division in January 2006, where I worked counterterrorism

and intelligence-gathering operations for approximately three years.  I was assigned to the Washington Field Office in May 2009 and charged with investigating international corruption, specifically violations of the Foreign Corrupt Practices Act (FCPA), as well as antitrust violations.  In January 2009, I was promoted to Supervisory Special Agent and assigned to the Counterterrorism Division of FBI Headquarters, specifically to the National Joint Terrorism Task Force.   In August 2012, I transferred within the Counterterrorism Division to the International Operations Section I, Continental US Unit V, where I program managed International Terrorism investigations in the Phoenix Division.  I am currently assigned to the Washington Field Office, Northern Virginia Resident Agency, Child Exploitation Task Force. Since joining the FBI, I have investigated violations of federal law.  As a federal agent, I am authorized to investigate violation of laws of the United States and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.  Since September 2014, I have been assigned to investigate violations of law concerning the sexual exploitation of children, including child pornography and child sex trafficking.  I have gained experience through both formal and on-the-job training in conducting these types of investigations.

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 2252A have been committed.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## STATUTORY AUTHORITY

5.      This investigation concerns alleged violations of 18 U.S.C. §2252A, relating to

material involving the sexual exploitation of minors. 18 U.S.C. § 2252A prohibit a person from

knowingly possessing or accessing sexually explicit images (child pornography) with the intent

to view them as well as transporting, receiving, distributing or possessing in interstate or foreign

commerce, or by using any facility or means of interstate or foreign commerce, any visual

depiction of minors engaging in sexually explicit conduct (child pornography).

## JURISDICTION

6.  This Court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has

jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## DEFINITIONS/TECHNICAL TERMS

7.  Based on my training and experience, and information acquired from other law

enforcement officials with technical expertise, I know the terms described below have the

following meanings or characteristics:

      a.      IP Address: The Internet Protocol address (or simply "IP") is a unique

      numeric address used by computers on the Internet. An IP address looks like a series of

      four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every

      computer attached to the Internet must be assigned an IP address so that Internet traffic

      sent from and directed to that computer may be directed properly from its source to its

3

destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      b.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      c.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any adversary that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

      d.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

e.      "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

f.      "Child Pornography" means the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. *See* 18 U.S.C. §§ 2252 and 2256(2)(8).

g.      "Computer" means "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." See 18 U.S.C. § 1030(e)(1).

h.      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not

5

limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      i.       "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      j.       "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

      k.       "Computer-related documentation" means written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

6

l.      "Domain Name" means the common, easy-to-remember names associated with an Internet Protocol address. For example, a domain name of "www.usdoj.gov" refers to the Internet Protocol address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for edOCEtional organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Internet Connection" means a connection required for access to the Internet. The connection would be provided by cable, DSL (Digital Subscriber Line) or satellite systems.

n.      "Internet Service Providers" or "ISPs" mean commercial organizations which provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television,

dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

o.      "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

p.      A "modem" translates signals for physical transmission to and from the Internet Service Provider, which then sends and receives the information to and from other computers connected to the Internet.

q.      A "router" often serves as a wireless access point and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. The router is in turn typically connected to a modem.

r.      "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic

8

abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons.  See 18 U.S.C. § 2256(2).

s.      "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image.  See 18 U.S.C. § 2256(5).

t.      "Website" consists of textual pages of information and associated graphic images.  The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

u.      "Wireless network" as used herein means a system of wireless communications in which signals are sent and received via electromagnetic waves such as radio waves.  Each person wanting to connect to a wireless network needs a computer which has a wireless network card that operates on the same frequency.  Many wired networks base the security of the network on physical access control, trusting all the users on the local network.  But, if wireless access points are connected to the network, anyone in proximity to the network can connect to it.  A wireless access point is equipment that connects to the modem and broadcasts a signal.  It is possible for an unknown user who has a computer with a wireless access card to access an unencrypted wireless network. Once connected to that network, the user can access any resources available on that network to include other computers or shared Internet connections.

v.      "Secure Hash Algorithm Version 1 hash value" (SHA 1 hash value) is an algorithm that processes digital files, resulting in a 160-bit value that is unique to that

file. It is computationally infeasible for two files with different content to have the same
SHA 1 hash value. By comparing the hash values of files, it can be concluded that two
files that share the same hash value are identical with a precision that exceeds 99.9999
percent certainty. There is no known instance of two different child pornographic images
or videos having the same SHA1 hash value.

### PROBABLE CAUSE

8.  Google has a variety of services to include Gmail, Google Drive, and Google Voice. An
individual can make one account on Google that gives them access to all of Google's services.
An individual can access his or her Google account from multiple devices, including computers,
smartphones, and tablets. Gmail is an email service. Google Drive is free cloud storage. Google
Voice allows a user to receive and make phone calls from their Gmail account. Text messages,
or SMS messages, can also be made using Google Voice, which will be available in the user's
Gmail account.

9.  Kik is an instant messaging application available on smartphones and tablets. It is used
to send messages, as well as photos, videos, and other content, to other users. Kik uses Wi-Fi or
a user's mobile data plan to send and receive these messages.

10. XXLCloud.com is a web-based cloud storage service provided by XXL Cloud, Inc.
located at 913 N Market Street, Suite 200, Wilmington, DE, 19801.

11. Leading up to April 13, 2016, Detective Timothy Palchak, the undersigned detective, was
acting in an undercover capacity ("UC") as part of the Metropolitan Police Department-Federal
Bureau of Investigation ("MPD-FBI") Child Exploitation Task Force. Your affiant had posted
numerous online bulletin messages on specific social media forums, which, based on your

affiant's experience and information gathered from other sources, are websites that are frequented by individuals who have a sexual interest in children and incest. The bulletin messages were intended to attract individuals with a sexual interest in children. Your affiant would respond to certain messages or post messages on these public forums and would provide his screen names to various messaging application accounts. Your affiant has a profile page in an online message board. This particular message board is known to your affiant as a place on the internet where users trade and discuss child pornography.

12. On April 14, 2016, an individual later identified as the defendant, emailed the UC via a Yahoo email account bearing an address of lanbnews@yahoo.com, bearing a screen name of Frank Schmeiser. The defendant indicated in his email that he was "intrigued" by the UCs pictures on one of the online message boards where the UC maintained a profile page as described above. The defendant stated in the Yahoo message that he has "an 11 year old granddaughter who I am willing to share photos and videos with you." The defendant sent a link to a "dropbox" account and wrote, "Here is a link to the first video I have of her." Dropbox is a form of digital storage in which a user can set up an online account to hold and share with others via an internet link large volumes of media. The UC clicked on the Dropbox link sent by the defendant and viewed the contents of the link. The link displays a video of a female child in a bathroom and depicts her from the knees down removing her pants and underwear outside of the shower. The video then depicts the child stepping into a shower and appears to be shot from the perspective of underneath the bathroom door. As the child gets into the shower nude, her buttocks are displayed in the video. The defendant's email further stated that he had a "second video" and that it and the "photos are much more revealing, if you're interested." The defendant

11

concluded the email writing, "Please send me a link to your daughter's 'exposures', and we will trade if you would like."

13. The UC responded to the defendant's email indicating he had "special pics" of his purported 9-year-old daughter on his phone and suggested that any further communications with the UC be via the cellular phone messaging application, KiK. The UC then sent the defendant an image of his purported daughter, which depicted the child lying on her side and facing with her back toward the camera, wearing a top and underwear that were pulled down slightly revealing the top of the purported child's buttocks. The image did not depict a real child.

14. The defendant responded that he had been "burnt many times before" and stated, "you hadn't really sent me anything as good as the video I've sent you, I'm going to send you a screenshot of the video. I hope you understand." Included in the defendant's email response was a second Dropbox link. The UC clicked on the link and it depicted a screen shot of the same female child in the shower in the same bathroom as the above-described video. The image depicts the female child completely naked, emerging from the shower. The image is a nearly full-frontal image of the child, with her chest visible, though the child's vaginal area is obstructed by a toilet in the foreground. The defendant wrote in his email that the images were being sent for the UC's "use only, and are not be shared with anyone." The defendant promised that any images sent by the UC would be kept for the defendant's personal use as well.

15. Approximately 50 minutes later, the defendant sent another email to the UC stating, "Here is a video I took of her at the water park," The defendant included a third Dropbox link and apologized for its quality, stating, "It was my first attempt at doing this." The UC clicked on the Dropbox link and included was a video of the same female child described above clothed in a

pink bikini-style swimsuit.  The child is depicted putting items into a locker while the camera focuses on the child's buttocks.  The background depicts what appears to be a waterpark.  The video then shows the child standing facing the camera adjusting her swimsuit.  A man's voice is audible in the video and states, "are we ready to party."

16. Approximately two hours later, the Defendant sent the UC a fourth Dropbox link.  The UC clicked on the link and observed that it contained the three videos described above as already having been sent via Dropbox.  A fourth video was included in the link that appears to be a recording taken by an individual holding a mobile recording device and walking behind a young female child, the same child depicted in the first three Dropbox videos described above, wearing the same pink bikini-style swimsuit.  The individual recording the video follows the child walking through what appears to be a waterpark, focusing on the back side of the child; at various times the child can be seen adjusting her swimsuit.  At the end of the video, the child turns and her face is visible; it is the same child depicted in the videos getting in and out of the shower.  Also included in the Dropbox link are numerous still images of the same female child in the pool, and the images depict the child's face.

17. During the course of the defendant sending these emails, the defendant was also communicating with the UC via KiK messenger.  The defendant used the KiK messenger screen name "Frankie118."  On Kik messenger, the defendant and the UC were discussing, among other things, the Dropbox and other links the defendant was sending to the UC.  At the beginning of the KiK chats, the defendant indicated that his granddaughter "lives 4 hours away."  The defendant represented that he lives in Pennsylvania and his granddaughter lives in Richmond, Virginia.  The defendant stated that he does not get any "play" with his granddaughter as a result

and asked the UC if he gets any "play" with his daughter, to which the UC responded, "not fully but some." The UC understood "play" to mean sexual activity with a child.

18. The defendant stated on KiK that the videos described above depicting the defendant's granddaughter were taken "under the door" and were "hidden camera video." The defendant indicated that he goes to visit his granddaughter where she lives, which is when he takes the videos. The defendant stated that he has about a "dozen" videos but that the "shower video is the most revealing" and is "crystal clear, and shows everything."

19. After sending the first Dropbox video, the defendant stated, "You've seen my gd [granddaughter's] ass, may I see your daughters?" The UC indicated he would send an image via email and sent the email image described above. The defendant indicated that the image was "tiny" and requested something "larger." The UC then sent the defendant two additional images, including one image of his purported daughter's underwear with a note stating "Frank, 4/14/16" and an image of the purported child's abdomen and underwear, with her shirt pulled up revealing one side of her chest-area. The images were not of a real child. The defendant responded to the UC sending these images by sending the videos of his granddaughter at the waterpark described above. The UC purported to have additional images and videos of his daughter performing sexual acts on the UC, though he possessed no such videos.

20. The UC asked the defendant if all of his "pics" were of his granddaughter, and the defendant responded that he has, "Thousands of photos and videos of random stuff." The defendant then complained that he had sent the UC a completely naked video of his granddaughter but that the UC had sent images of the UC's purported daughter that were not naked. The defendant stated he had a video he had taken from the same vantage point as the

14

other videos he already had sent the UC depicting the defendant's granddaughter in the shower, but that the video depicted images of the granddaughter's "pussy" as she was drying herself after the shower. The defendant did not at that time send such a video, instead stating, "When will you be able to take the pics? I would really not like it if I gave you what you wanted and had to wait days for you to send something back. Just being completely honest with you." The UC responded that he understood but could not send anything until sometime over the weekend when he had his next visitation with his daughter.

21. The defendant then continued the negotiation as follows:

    a.  Defendant:    Let me know if you think this is fair. I can send you links for many videos that are not my gd, but I don't send her video until I get at least two pictures from you. I promise I will send it to you at that time. What do you think? We can negotiate.

    b.  UC:    I think that is a fair bet.

    c.  Defendant:    Thank you. I try to be fair. Can you send other videos also, in the meantime? The weekend is so far away. Lol.

22. The defendant then continued asking the UC if the UC had naked videos of his daughter and asked the UC to "be explicit" describing the videos. The defendant then stated, "My fantasy with my gd is to lick her dry when she gets out of the shower."

23. During the course of the KiK exchange, the defendant asked the UC if the UC had "any accounts with online storage sites? Xxlcloud, box, dropbox, or any like those?" When the UC responded that he did not, the defendant indicated that most of his videos were contained in xxlcloud and instructed the UC how to sign up for an account. Once the UC stated he had set up

an account on xxlcloud, the defendant sent the UC an invite via email to view the contents of the link described above and instructed the UC how to access the contents of the link. The defendant also sent the UC a password to access the link the defendant sent via email to the UC to an xxlcloud account.

24. "Xxlcloud" is similar to Dropbox and allows a user to set up an account to store large volumes of digital media. When the UC clicked on the xxlcloud link and used the password provided by the defendant, he was able to view the contents of the defendant's folder. Included in the defendant's folder were over 100 video files. Included among the videos files were the following examples of videos depicting child pornography:

> a. A video file approximately 2:53 minutes in length entitled "!!!New!!! 2010 Sweet 8Yo Veronica Satisfy Dad With Mouth Really Good-Pthc_toAVI" that depicts a Caucasian female child approximately eight years of age wearing blue pants and a white short-sleeve shirt with pink tank top laying on top of a Caucasian male adult with his pants pulled down. The child performs oral sex on the adult male's erect penis throughout the duration of the video.
>
> b. A video file approximately 29 seconds in length entitled, "!!sdpa kristin 7 años chupando y tomando leche" depicting a Caucasian female child approximately seven years of age with a pony tail wearing beige leggings and a dark pink long-sleeve shirt with a yellow design on the front standing next to a Caucasian male adult wearing blue track pants and a grey short-sleeve shirt. The adult male approaches and pulls down his pants. The child performs oral sex on the adult male's erect penis throughout the balance of the video.

   c.  A video file approximately 2:36 minutes in length entitled, "(PTHC 2013 PTXX
       OPVA) Daddy and 5yo April- suck and Fuck big Cock - Eye of the tiger (Vey
       good)" depicting a Caucasian female child approximately five years of age
       dressed in a tiger costume with a tiger nose piece kneeling on a bed. A Caucasian
       male adult stands just off camera. The adult male presents his erect penis to the
       child and the child performs oral sex on the adult male throughout the balance of
       the video.

   d.  A video file approximately 2:58 minutes in length entitled, "(Pthc) Fevrier Girl
       9Yo 3 (2014)" depicting a prepubescent Caucasian female child dressed in a
       purple bath robe. A Caucasian male adult sits on a chair with pants down and his
       penis erect. The child performs manual sexual stimulation of the adult male's
       penis. Later in the video the child opens her bathrobe, lowers her underwear and
       repeatedly inserts her own finger into her vagina.

   e.  A video file approximately 1:43 minutes in length entitled, "!!NEW 7-8 j. Linda-
       Fucked!" depicting a naked Caucasian female child approximately seven years of
       age. A naked Caucasian male adult is on a bed with his penis erect. The child
       climbs on top of the adult make and mounts his erect penis. The adult male
       penetrates the child's vagina with his penis for the balance of the video.

25. The following day, April 15, 2016, the defendant sent the UC a KiK message asking the
UC whether he had an opportunity to view the videos to which the defendant had sent a link.
The defendant asked the UC, "Anything to offer in exchange for what I have sent you? Over 50
videos, and what I can share of my gd for now." The UC told the defendant, "tell me what you

17

want."  The defendant stated, "Anything you have to offer is acceptable, even if it is not of your daughter."  The UC stated he did not have anything from the internet but could make a video of his daughter, and asked the defendant, "Anything specific you want to see?"

26. The defendant also asked the UC how far Richmond is from the UC's location, to which the UC responded, "only 45 min from me."  The defendant stated in response, "Maybe we can meet at the water park one weekend.  You can see my gd live, and I can see your daughter."

27. The defendant also stated during the KiK chats that his son, the father of the granddaughter the defendant recorded, "has caught me videotaping her on several occasions."  The defendant said it was tough to play off and, as a result of it, hasn't seen his granddaughter since January because his son was angry.  The defendant also stated during the course of the KiK communications the names of his son, his son's wife, and his granddaughter.

28. The defendant offered to send the UC a description of how he was able to take the videos of his granddaughter in the shower.  The defendant then sent to the UC an email via Yahoo with the subject "[xxx]'s video."   The email stated as follows:

     a. OK, here is the story of how I got [defendant's granddaughter]'s video.

     b. I was making plans to visit my son for the 4th of July. They told me about the water park about an hour from their house, and that they had season passes.

     c. I figured it was my opportunity to at least see [xxx]  in a bathing suit. I had never seen her in a bathing suit before; I was hoping it wasn't going to be a one-piece suit.

     d. My son had told me previously, that his girlfriend, [xxx] , was working that day, and they only had one working car, so he was going to have to take her to work

18

before we went to the park. I have a minivan, so I was going to have to do something to make sure that he was going to take [defendant's son's girlfriend] to work, leaving me alone with the kids. I filled my car up with miscellaneous items, telling him I was moving things around, and didn't get a chance to finish before the weekend.

e.  [defendant's granddaughter] didn't take a shower the night before, so one of the conditions of us going to the water park was that [defendant's granddaughter] had to take a shower while my son was taking [defendant's son's girlfriend] to work. That was when I started planning.

f.  The morning of the 4th, [defendant's son's girlfriend] woke up the kids and told [defendant's granddaughter] she had to take a shower. I was already awake, because I was excited about possibly getting more than pictures and videos of her in just a bathing suit. Then my son took [defendant's son's girlfriend] to work. I knew he was going to be gone about an hour, so I needed to get started.

g.  After they left, I waited about 10 minutes to see if they may be coming back in case they forgot anything. When they didn't come back, I knocked gently on [defendant's granddaughter]'s door making sure she was up. I knocked gently, because I was hoping her brother went back to sleep, and I didn't want to wake him up. I went back to the living room, (they live in a single wide mobile home), and waited for her to come out of her room.

h.  I heard her come out of her room, and enter the bathroom. I waited about 30 seconds, and then went down the hall to the bathroom.

i.  (As an added note: For some reason, when they built the mobile home, they left a 2 inch gap under all the inside doors. I don't know why, but it helped me immensely. I didn't have to worry about hiding a camera, and her possibly seeing it.)

j.  There is a window across the hall from the bathroom, but because it was still dark outside, there wasn't any light. Basically, if she were to look under the door, all she would see is black. The case for my phone is a dull black color, so it worked out perfectly.

k.  I lay down in the hall, and aimed my camera under the door. I took me a couple of seconds to get situated, so that's why the beginning of the video is dark and moving a lot.

l.  My heart was pounding, because if her brother came out of his room, he would have stepped on me and I would have been caught. I'm surprised the camera wasn't shaking as much as I was.

m.  Once I had the camera close to the right position, I was able to see her feet and legs. She was standing about halfway between the door and the tub. I saw her remove her pajama bottoms, her panties, and then her pajama top.  I didn't want to move the camera further under the door, because the floor is a light color, and I didn't want to take a chance of her seeing the camera. I waited a couple of seconds, and when it looked like she was about ready to get into the tub, I moved the camera a little closer. She checked the water temperature, and then stepped into the tub. I got a beautiful video of her ass as she was stepping into the tub.

n. (That is where I got the screenshot from that I sent to you)

o. I waited about 7 minutes while she was in the shower with the curtain closed, hoping and praying that her brother wouldn't come out of his room. I had stopped recording, although I should have just paused the camera for one continuous video.

p. Those 7 minutes took forever to pass!

q. I never moved the camera from its spot, so all I had to do was start it again once she opened the shower curtain.

r. She opened the curtain, and I got to see the object of my desires in all her naked glory. I was in heaven! I had an excellent complete view of the front of an angel. I saw beautiful budding breasts, hips starting to spread, and a pussy with barely a wisp of hair on it. Oh, the joy!

s. She grabbed the towel and started to dry herself. At one point, she bent over to dry her foot, and she was behind the toilet. I thought the video was ruined, but for some unexplained reason, she side stepped twice to her left, which left everything out in the open for me to see. This is where she spread her legs and rubbed her pussy with the towel

t. When she finished drying one foot, she got out of the tub and bent over to dry her other foot. I got to see an excellent view of her budding breasts with a tan line around them. This was what I was waiting for! That view will always be burned in my memory.

u. She continued drying herself, and I tried to stay as long as I could. I got another

view of her drying her pussy, but then she turned toward the door.  I stopped
recording at that point.

    v.  After sending the above-described email, the defendant continued on KiK
messenger, "Right after her shower, I took a shower and came all over the loofa
she uses."  The defendant further stated,  "I have used that video to get off
hundreds of times since then."  The defendant also stated about the video, "I was
watching the whole thing while I was recording.  It just took a couple of seconds
in the beginning to get in the right position" and noted that he was "afraid of
getting caught" because his grandson was asleep in the next room.

29. The defendant then engaged the UC in the following KiK colloquy:

    a.  Defendant:    You asked what custom video I want to see, right?

    b.  Defendant:    Hello?

    c.  UC:    Yes

    d.  Defendant:    …My request for a video involves her sleeping and you posing her

    e.  UC:    Ok cool that will be easy

    f.  Defendant:    Maybe not once you see the pose.  I'll try to find the picture and
send it to you.

    g.  UC:    Ok cool…

    h.  Defendant:    Just sent it now … That's the first part.

    i.  UC:    OK

30. The defendant then sent the UC an email via the defendant's Yahoo account with the
subject line, "Pose Request."  In that email the defendant stated:

      a. Here is the pose I would like to see [UC's daughter] in.

      b. If you could start with her clothed in this position, get a video of her from all angles around her, and then undress her and get another video around her, while she is still in the same position, that would be great. Look closely, notice her arms are between her legs, which should open her thighs just enough to see her sweet, young, pussy.

31. Attached to the email was a .jpg image of a prepubescent child posed lying facedown on the floor with her face turned toward the camera, her arms tucked underneath her body between her legs, and up on her knees so that her buttocks were elevated.

32. After sending the above-described "Pose request" email, the defendant then messaged the UC again on KiK, stating:

      a. Defendant:    The second part is her naked, spreadeagle on the bed, and you coming on her ass

      b. UC:    Perfect that is how I will finish it off

      c. Defendant:    Then, can you turn her over and come on her pussy, too? And for the last part, come in her mouth?

      d. UC:    Yes I'll some of her front side

      e. Defendant:    I understand you may not be able to do all this at the same time, but I can try to be patient if I know I will get it all

33. The UC then offered to engage in a "FaceTime" phone call with the defendant rather than sending a video, but the defendant responded, "To be completely honest with you, I would prefer a video, so I can use it to get off to many many times. Can FaceTime be saved? Never used it."

34. Shortly thereafter, the defendant stated, "The video of [defendant's granddaughter] shows everything, including her face. Could you please show me the same courtesy, and include [UC's daughter]'s face in the video? I promise you that this video will not leave my possession or be shared with anyone else. It does seem fair, doesn't it. I hope that you will make the same promise. The defendant then clarified, "Just to be clear, is it ok with you that I used [UC's daughter]'s video to get off with? I am sure you will enjoy [defendant's granddaughter]'s video."

35. During the evening hours of April 15, 2016, the defendant again emailed the UC from the defendant's Yahoo account. The subject line was "Request pose 2." The text of the message read as follows: "Hey buddy. If you would be so kind, I'd appreciate it if you would call me tomorrow I would like to talk to you about my request for posing [UC's daughter] for the video on Sunday."

36. During the course of the KiK exchange, the UC also sent the defendant his phone number and indicated that the defendant could communicate with the UC by text message. The defendant did send a series of text messages to the UC during the same timeframe that the above communications were occurring. The defendant sent the text messages to the UC from the telephone number (717) 386-0548. The defendant sent the UC a text message stating with regard to the video the defendant requested of the UC's purported daughter, "I really would prefer a video, so I could use it over and over again. Besides, my internet is through my phone at home and it really sucks." When the UC indicated he understood, the defendant continued, "I would appreciate it greatly. After all, we are trading a video for a video, right?"

37. On April 16, 2016, the defendant sent the UC a text message stating, "Hey buddy. I need

you to call me in the morning as soon as you get this. I'm going to be changing the videos in my xxlcloud folder, so I need to be sure you got everything you wanted from there. Also, I would like to talk about Sunday, if that's alright with you."

38. In accordance with the defendant's request, on April 16, 2016, the UC contacted the defendant via telephone at the phone number above from which the defendant had texted the UC, per the defendant's request. The phone call was recorded. The defendant answered the phone. The defendant informed the UC that he was planning to take videos out of his xxlcloud storage and wanted to make sure the UC had downloaded whatever he wanted. The defendant then continued that he believed he had "over 3,000." The UC informed the defendant that the UC did had access to his purported daughter on Friday and would have her all weekend and the defendant should let him know any requests. The defendant inquired, "your daughter is pretty accommodating?" The UC responded yes and that she is starting to get more "into it" and there are no issues. The defendant indicated he was leaving on Thursday (April 21, 2016) for North Carolina and would not be around. The UC offered to Skype live with the defendant while he was "doing stuff" to his purported daughter, and the two then discussed logistics of doing so. The defendant told the UC not to change anything with his daughter's schedule so as not to "raise red flags" or "suspicion." The defendant stated he had concerns about Skype because defendant would be traveling and does not get great service on the road. The defendant stated he would send the UC an email he had previously drafted and then the UC should call him back.

39. The defendant then sent from his Yahoo mail account the following email message:

    a. Good afternoon, buddy.

    b. I know we discussed my request earlier, but I would like to make sure that there is

a complete understanding of what I requested.

c.  Please bear with me while I explain further.

d.  First, make sure the lighting in the room is adequate from all directions.
    Sometimes the camera lighting is too bright, and washes out the subject if you get
    too close.

e.  I would like to start with Emma posed as you see in the picture.  It may be easier
    to start with her in the middle of the floor, so you can get completely around her
    while you are taking the video. If you could fade in to the video, that would be
    great. Please take at least a minute to go around her completely, starting at the
    position in the sample picture, and going around her in a counter-clockwise
    direction, around behind her focusing on her head for about 15 seconds, the other
    side for 15 seconds, her legs and ass for 15 seconds, and then back to the original
    position, focusing on, and getting a closeup of her face for 15 to 30 seconds.

f.  Then, if you would set the camera down behind her, and to the right of her, but far
    enough away that you get all of her in the picture.  Please take about 2 minutes to
    undress her very slowly, first the pants, then the shirt, and finally, the panties.

g.  Make sure she is in the original position as shown in the picture. Her thighs
    should be perpendicular to the floor, and her arms should be between her legs

h.  Now, here is the tricky part.  If you could, start from where the camera is, and
    work your way around her counter-clockwise again, and record about 15 to 30
    seconds on each side. Once you get to the top of her head, take a video from the
    top of her head, getting as close as you can, but you can still see both sides of her

26

in the video, and work your way down her back, over her ass, and down to the soles of her feet. Come back up to her head, and continue working in a counter-clockwise direction. Once you get to her feet, do the same thing as at her head, starting with the soles of her feet, slowly working your way up her legs, past her ass, up her back to the top of her head, and then back down her back to her ass, and stopping to zoom in on her sweet, succulent pussy for at least 30 seconds. Then, back up a little getting all of her body from the soles of her feet to her head in the frame, and fade out.

40. After receiving the above email, the UC made a second recorded phone call to the defendant at the same phone number. The defendant answered. The UC stated he read the email and indicated he understood what the defendant wanted. The defendant said if the UC had questions about the contents of the email, there was a week to discuss it. The defendant also asked the UC if this was something he could do without getting the UC's face in it, to which the UC responded "yes." The UC stated that he did not want the video traded, and the defendant assured the UC that this is "private stuff" he would not share. The defendant stated that he did not want the UC to share the videos of the defendant's granddaughter because not only is the granddaughter in the video, but so is the defendant's son and daughter-in-law. The defendant stated he would not betray the UC because it would end a "resource" he was looking forward to having. The defendant and the UC then had further conversation about meeting at a waterpark with the defendant's granddaughter and the UC's purported granddaughter. The defendant expressed that his concern about the waterpark is that once he met the UC's daughter, he would be walking around the waterpark "with a hard-on."

27

41. During this second phone call, the defendant again asked if, in exchange for the video the defendant had sent the UC of his granddaughter, if the UC could send the defendant some videos. The UC explained he did not have any further videos to send the defendant because of issues related to his computer. The UC explained he had previously used "Limewire" to obtain videos. The defendant stated that he had used Limewire as well, and that approximately 4-5 years ago the police had showed up at his house with a search warrant because of what he was doing on his computer. The defendant explained that the police took his computer and a hard drive and "don't get me wrong, I had stuff on there, but for some reason, I don't know why, I haven't heard from them since." The defendant indicated he had gotten lucky and that it "scared the fuck out of me."

42. The defendant continued the conversation by discussing his "history" and stated that the reason he was living alone in the apartment the police had come to with the warrant was because when his daughter was 10 years old, the defendant took a shower with her and his wife found out. The defendant stated that his wife went to a therapist about it and that is why they separated. The defendant stated he "never did anything really, really hard core with her" but "there were some other instances where, you know, I undressed her and fondled her." The defendant stated that his daughter never told until later, once the defendant was arrested for sexual assault because of the "shower incident," which was in approximately 1991. The defendant stated he went to jail for "like two weeks" and is now not allowed to be alone with his (now grown) daughter's children. The defendant stated that his son knows what happened with the defendant's daughter and that is why the defendant's son "watches him like a hawk" with the son's daughter. The UC's phone then ran out of battery and the call cut off.

28

43. The UC then called the defendant back via telephone a third time to resume the conversation. This call was also recorded. The UC apologized for dropping the call. During the conversation, the defendant stated that if anyone else did "something like this to our daughter, we'd kill them." The defendant stated that "we don't hurt them." The defendant then stated that he could provide a lot of videos to make up for any difficulty he may have getting "live action" in the future.

44. The defendant further stated that he was "very grateful" for the "opportunity" he had to get the videos that he had taken of his granddaughter. The defendant stated that he was "going to look for more" opportunities. The defendant said he had to "really plan" for the opportunity to take the video of his granddaughter. The defendant acknowledged that he got some good "pussy" shots of his granddaughter and that she was "fully and completely" exposed. The defendant stated that he thought the toilet in the bathroom would obstruct his video given the angle he was at filming. The defendant also stated that he is "a fool for budding breasts." The defendant then stated that it was a "miracle" that his granddaughter moved where she did in the bathroom so he was able to capture the video.

45. During the course of the conversation, the defendant and the UC discussed the UC Skyping the defendant while abusing his daughter. The defendant stated that he would "appreciate more" if the UC would record a video rather than Skype so he can use it over and over to masturbate.

46. Defendant stated that he took the video of his granddaughter on July 4 of lasted year and has jerked off to it over 100 times. He indicated he had masturbated to the video up to 4-5 times per day. The defendant also stated that he got into the shower immediately after taking the

video and masturbated in the shower, ejaculating on his granddaughter's loofa.

47. The defendant then confirmed again that the UC would not see his purported daughter until Friday. Defendant requested again naked pictures of the UC's purported daughter and asked what the UC thought of "tribute" pictures. Based on his training and experience, the UC understood a "tribute" picture to be an image sent to another person on which the recipient masturbates and then returns to the sender. The defendant also stated he would be interested in photos of the UC's purported daughter's panty drawer.

48. The defendant indicated that if the UC were to send a naked image of his purported daughter, the defendant would "tribute" it. The UC agrees he will do so.

49. The defendant also sent to the UC via text message an image of a pair of pink bikini bottoms appearing to match those worn by the defendant's granddaughter in the waterpark videos described above. The defendant stated in the message, "You've seen the videos at the water park. Here is the bathing suit I told you that I took. If you look closely at the video, you can see the OP on the back of her bottoms [referring to an "OP" logo depicted in the image of the pink bikini bottoms].

50. During the early morning hours of April 17, 2016, the defendant again emailed the UC from the defendant's Yahoo account, stating, "If you get a chance, give me a call today. We can talk about getting videos of your nieces. What can you tell me about them? Please describe them to me."

51. The defendant also texted the UC that same day, "Hey buddy. Just came up with some ideas for next weekend, and some ideas for your nieces. If you're interested in them, please call me today before 7 pm." The defendant continued by proposing a date on which the defendant

would bring his granddaughter and the UC should bring his purported to meet at a waterpark so the two men could see one another's children.

52. On April 14, 2016, Administrative subpoenas were issued by the FBI and served on KiK Messenger and on Yahoo requesting subscriber identification information associated with the aforementioned accounts. On April 15, 2016, both companies responded and provided the requested information. The KiK account described above was linked to the Yahoo email address and both accounts were registered under the name Frank Schmeiser. A telephone number, 717-386-0548, which is operated on the Sprint network, was associated with the Yahoo address. All of the IP addresses provided by KiK and Yahoo resolved to Sprint PCS.

53.  Upon receipt of this information, agents with the FBI used available open source and law enforcement sensitive databases to identify the subscriber of 717-386-0548 as Glen Schneider SR. A social networking profile (www.facebook.com/glen.schneider.58) was found to be linked to the telephone number as well. Review of publicly available information on this profile identified Schneider SR's son as [xxx]  Schneider JR of Prince George, Virginia. The defendant's resides with a woman and her daughter, the names of whom match the names of the defendant's granddaughter and her mother given by the defendant in his KiK messages and emails to the UC. In addition, comparison of publicly available images on Facebook of the individual bearing the name of the defendant's granddaughter were compared to the images of the female child depicted in the videos sent by the defendant to the UC via Dropbox and both depicted the same female child.

54. On 04/16/2016, xxlcloud.com was served with a subpoena for subscriber information associated with the xxlcloud link and password provided by the defendant.  The returns provided

by xxlcloud.com included two associated email accounts, specifically including

"LANBNEWS@YAHOO.COM" and "LANBNEWS@GMAIL.COM."

## BACKGROUND CONCERNING E-MAIL

55. In my training and experience, I have learned that Google, Inc. provides a variety of on-line services, including electronic mail ("e-mail") access and cloud storage, to the public. Google, Inc. allows subscribers to obtain e-mail accounts at the domain name gmail.com, like the e-mail account listed in Attachment A. Subscribers obtain an account by registering with Google, Inc. During the registration process, Google, Inc. asks subscribers to provide basic personal information. Therefore, the computers of Google, Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Google, Inc. subscribers) and information concerning subscribers and their use of Google, Inc. services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

56. In my training and experience, e-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know

that even if subscribers insert false information to conceal their identity, I know that this information often nevertheless provides clues to their identity, location, or illicit activities.

57. In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

58. In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

59. As explained herein, information stored in connection with an email account may

provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each offense-element, or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, I know that the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, email providers typically log the IP addresses from which users access the email account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the criminal activity under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).  Finally, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation.  For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## **CONCLUSION**

60. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, Inc. who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____

Special Agent Ted P. Delacourt
Federal Bureau of Investigation

Subscribed and sworn to before me on _____, 2016

_____

UNITED STATES MAGISTRATE JUDGE